614 So.2d 285 (1993)
BLUE/GRAY PIPE & SUPPLY, INC., Plaintiff-Appellee,
v.
INLAND BAY DRILLING & WORKOVER, INC., Defendant-Appellant.
No. 92-110.
Court of Appeal of Louisiana, Third Circuit.
February 10, 1993.
Writ Denied April 30, 1993.
*286 Funderburk & Herpin, Michael Herpin, Abbeville, for plaintiff-appellee.
Sonnier, Hebert & Hebert, K. Wade Trahan, Abbeville, for defendant-appellant.
Before DOMENGEAUX, C.J., and DOUCET and DECUIR, JJ.
DECUIR, Judge.
The question before the court in this appeal is whether the defendant is contractually bound to pay for drilling pipe rental in connection with certain drilling operations.
The suit from which this appeal arises has a complicated factual background. Originally, Irish Oil & Gas Co. (Irish) operated the Lacassine B-5 well in Cameron Parish. Irish found itself unable to complete the well and unable to pay outstanding debts to a number of vendors, including Blue & Gray Pipe & Supply, Inc. (B & G), plaintiff herein.
Although the record contains no signed documents evidencing an agreement, it is apparently undisputed that certain of the vendor/creditors, including B & G, formed some kind of association known as Plan IV Oil Company (Plan IV) at the instigation of Robert Beauboef, the major vendor/creditor. The Plan IV vendors agreed with Irish to take over operation of the well in return for a working interest in the well plus payment to each vendor of 200% of the invoices outstanding at the time of the agreement. The members of Plan IV further agreed to supply their goods and/or services without cost.
After operating the well for some months, Plan IV also found itself financially unable to complete the well.
In December 1989, Plan IV, represented by Beauboef, entered an agreement with Inland Bay Drilling & Workover, Inc. (Inland), as follows:
By Letter Agreement dated August 8, 1989, Irish Oil & Gas Company, Post Office Box 42429, Houston, Texas XXXXX-XXXX, agreed to assign to Plan IV Oil Company an 80% working interest in and to the Lacassane B-5 Well located in Section 7, Township 12 South-Range 4 West, Cameron Parish, Louisiana, and the four Irish (Coronet Exploration, Inc.) leases, plus an 80% interest in the rights to be earned by Irish under the Mobil and Amoco farmouts, all subject to the Coronet letter agreement with Irish Oil & Gas.
Plan IV Oil Company has offered and Inland Bay Drilling & Workover, Inc. has agreed to acquire a working interest in the B-5 well subject to the following terms and conditions:
(1) Plan IV Oil Company will assign a 20% of 8/8ths working interest in the above well, leases and farmouts to Inland Bay Drilling & Workover, Inc., a 02½% interest to T.W. Myers, a 01% interest to Orel Herhiser, and a 01% interest to Donald Geddes III. In return for said assignments of interest, Inland Bay agrees to pay 100% of the remaining costs necessary to place the well into a sales line if said well is completed successfully or, if applicable, the cost of plugging and abandoning said well and restoring the premises in a satisfactory manner. All operations through completion or abandonment under the terms of this agreement shall be at Inland Bay's sole risk and expense and Inland Bay agrees to indemnify and hold Plan IV harmless from and against any and all claims, demands, causes of action out of or incidental to their operations.
(2) In return for the assignments of interest specified above, Inland Bay agrees to make a good faith effort to re-enter, evaluate, test and complete the B-5 well, subject to force majeure and Gulf Coast conditions. In the *287 event that mechanical difficulties preclude a successful completion despite a good faith dilligent effort on Inland Bay's part or in the event that testing indicates that the well is non-commercial, Inland Bay will have the option to cease further recompletion operations at its sole election. In either case, Inland Bay will earn no rights in the well, including salvage rights, and must either allow Irish Oil & Gas Company to take over the well and attempt a completion, or, if Irish declines to takeover, must plug and abandon the well. Under any of the foregoing alternatives, Plan IV must surrender the entirety of the working interest acquired from Irish Oil & Gas including the interest committed to Inland Bay et al by virtue of this agreement. As an integral part of this agreement, it is understood that only a good faith effort is required on Inland Bay's part to attempt a completion of the B-5 in return for the assignments of interest specified herein, and no further liability or obligation shall be incurred by Inland Bay et al other than those specified by this letter agreement.
(3) Plan IV Oil Company hereby acknowledges that there are a number of outstanding invoices in existence relating to workover operations on the B-5. Inland Bay has agreed to provide funds sufficient to cover certain of these invoices, said funds to be provided at Inland Bay's discretion upon request by Plan IV. Plan IV hereby acknowledges that any of the remaining invoices are the sole responsibility of Plan IV and that said invoices will be paid out of Plan IV's interest in and to the B-5 well.
On January 5, 1990, B & G, after being issued a purchase order number by an Inland employee, began issuing monthly invoices for drilling pipe rental. Inland did not pay the invoices.
In March 1990, Inland discontinued drilling operations and tendered the well back to Irish. On May 11, 1990, B & G filed a petition on open account against Inland. Inland filed exceptions of no cause of action and no right of action which were denied. In November 1990, B & G's pipe was removed from the well and returned. At that time, the well was apparently plugged.
A judge trial was held on August 19, 1991, and September 24, 1991. At the close of evidence, the trial judge rendered oral reasons for judgment. A judgment conforming to those reasons was rendered ordering Inland to pay pipe rental from December 12, 1989, through May 31, 1990, in the amount of $130,278.18 with legal interest from May 11, 1989. Inland appeals.

OBLIGATION OF INLAND
The defendant first argues that the trial court erred in finding that Beauboef, representing Plan IV could not bind B & G in attempts to continue drilling. However, a reading of the trial judge's oral reasons for judgment reveals no finding that B & G was not bound by the contract between Plan IV and Inland.
Inland further argues that B & G should be bound by the terms and conditions of the contract between Plan IV and Inland. We find no difficulty in doing so. The question remaining concerns what obligations were imposed on Inland by that contract.
La. C.C. art. 2045 provides that:

Interpretation of a contract is the determination of the common intent of the parties.
Inland argues that, in this case, the intent of the parties was that Inland would not be responsible for the costs of rig, road or pipe rental. While this exclusion is not spelled out in the contract, Inland argues that the contract is ambiguous and that testimony introduced at trial shows that it was the intent of the parties to exclude those costs.
Generally, when the provisions are clear and unambiguous, written contracts cannot be varied, explained or contradicted by parol evidence, and the meaning or intent of the parties must be sought within the four corners of the *288 instrument. Guillory v. Calcasieu Parish Police Jury, 410 So.2d 1213 (La. App.3d Cir.1982); Capizzo v. Traders and General Insurance Co., 191 So.2d 183 (La.App.3d Cir.1966). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046
American Waste v. Sanitary Landfill Com'n, 578 So.2d 541 (La.App. 3rd Cir.), writ denied, 581 So.2d 694 (La.1991).
After reading the contract, we cannot agree with the defendant that it is ambiguous.
The contract clearly provides both that:
"... Inland Bay agrees to pay 100% of the remaining costs necessary to place the well into a sales line if said well is completed successfully or, if applicable, the cost of plugging and abandoning said well and restoring the premises in a satisfactory manner."
and that:
"All operations through completion or abandonment under the terms of this agreement shall be at Inland Bay's sole risk and expense and Inland Bay agrees to indemnify and hold Plan IV harmless from and against any and all claims, demands, causes of action out of or incidental to their operations."
We find nothing in this agreement which would indicate that the parties intended anything other than the payment of all costs by Inland. Since the agreement is clear and unambiguous, it may not be varied by parol evidence. Accordingly, the trial judge correctly found Inland liable for payment of pipe rental from December 12, 1989 through May 31, 1990.

CONFLICTING STATEMENTS BY TRIAL JUDGE
Finally, Inland argues that their case was prejudiced by a statement made by the trial court at the end of the first day of trial which conflicted with his ultimate ruling.
The defendant does not cite, and we cannot find, any authority which prohibits such a statement by a trial judge in a civil, non-jury case. Further, defendant has not shown how he was prejudiced. As a result, we find no error here.
For these reasons the judgment of the trial court is affirmed at the cost of the defendant.
AFFIRMED.
DOUCET, J., dissents and assigns reasons.
DOUCET, Judge, dissenting.
I respectfully dissent from the opinion of the majority in this matter. After reading the contract, I believe that it is ambiguous.
The trial court, in rendering judgment, relies on the following contract provision:
"... Inland Bay agrees to pay 100% of the remaining costs necessary to place the well into a sales line if said well is completed successfully or, if applicable, the cost of plugging and abandoning said well and restoring the premises in a satisfactory manner."
The trial court interpreted this to require payment of "all costs" under all circumstances. However, this provision provides for payment of all costs only "if said well is successfully operated." The Lacassine B-5 well was not successfully completed.
The contract further provides that:
"... All operations through completion or abandonment under the terms of this agreement shall be at Inland Bay's sole risk and expense and Inland Bay agrees to indemnify and hold Plan IV harmless from and against any and all claims, demands, causes of action out of or incidental to their operations."
(emphasis added)
However, the agreement does not make it clear which expenses of operations were contemplated. This is particularly obscure in light of the previous agreement entered by the creditor/vendors in forming Plan IV and taking over the operation of the well whereby B & G agreed not to charge for pipe rental in return for the chance of future profit. As a result, I believe we *289 should look to parol evidence to explain the terms of the contract.
The President of B & G, Arthur Felcher, testified that Robert Beauboef told him Inland would pay for pipe rental. However, E.M. Christenson, an independent oil man, and Abby Broussard, President of Inland, both of whom were present at the contract negotiations indicate that the parties did not intend for the expense of pipe rental to be included in the amounts payable by Inland. Robert Beauboef's testimony was not clear as to what was agreed upon during the contract negotiations. He did, however, testify that he told Inland not to worry about paying B & G invoices until after the well was completed. Finally, Felcher's testimony indicated that B & G, as a member of Plan IV, expected to profit substantially if Inland successfully completed the well.
In light of this evidence, I believe that it was the intention of the contracting parties to exclude pipe rental from the costs payable by Inland.
As a result, I would reverse the judgment of the trial court and dismiss plaintiff's claims.